IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2013

## JASPER LEE VICK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 02-09113     Chris Craft, Judge**

---

**No. W2012-01477-CCA-R3-PC  - Filed June 4, 2013**

---

The petitioner, Jasper Lee Vick, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he was denied the right to a speedy trial and he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the appellant, Jasper Lee Vick.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted of one count of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of sexual battery, arising out of an encounter with his girlfriend's fourteen-year-old daughter. State v. Jasper L. Vick, No. W2005-00467-CCA-R3-CD, 2006 WL 722173, at *1 (Tenn. Crim. App. Mar. 22, 2006).

The underlying facts of the case were recited by this court in its first opinion on direct appeal as follows:

[The victim's mother] testified that [the petitioner] began living with

her in her apartment in December 1999. At the time of the offenses, [the victim's mother] was seven and one-half months pregnant with [the petitioner]'s child. [The victim's mother] said that [the petitioner] took her to work on February 14, 2001, between 5:15 a.m. and 5:30 a.m., in [the victim's mother's] red, 1989 Oldsmobile Cutlass. [The victim's mother's] mother arrived at her place of employment around 8:15 a.m., and told [the victim's mother] that she needed to go home. When [the victim's mother] arrived, the police were at her apartment.

[The victim's mother] identified the comforter that was on the bed of her daughter, the victim in this case. [The victim's mother] said that she never used the comforter after [the petitioner] began living with her. [The victim's mother] said that she and [the petitioner] had sexual intercourse about a week before the offenses, but not on her daughter's bed.

On cross-examination, [the victim's mother] said she had a "nice relationship" with [the petitioner]. She acknowledged, however, that she called the police in July 2000, when [the petitioner] got upset and struck his daughter who was visiting them. [The victim's mother] said that [the petitioner] never took the victim to school, because the school was located across the street from their apartment. [The victim's mother] said that sometimes her brother and his girlfriend spent the night in the victim's bedroom. She denied that her sister and her boyfriend had sexual intercourse in the victim's bedroom.

[The victim's mother] acknowledged that her daughter did not suffer any physical injuries during the incident, and [the victim's mother] did not take her daughter to Child Advocacy until the day after the offenses.

The victim testified that she was fourteen years old at the time of the offenses. She said that [the petitioner] took her mother to work on February 14, 2001, while she was still asleep. When [the petitioner] returned, he came into her bedroom and showed her a "crack pipe" fashioned like a sex toy. The victim said that she told [the petitioner] to leave her alone, and he told her it was time to get up for school. The victim got up and went into the bathroom. [The petitioner] was still sitting on her bed when she returned. The victim said that [the petitioner] did not have a shirt on, but that was not unusual. [The petitioner] told the victim to turn off the light and close the bedroom door. She refused. [The petitioner] stood up, and the victim saw that he was naked. The victim asked him what he was doing, and [the petitioner] told her

that he was going to "have sex" with her because her mother would not. The victim kept telling [the petitioner], "no."

The victim could not remember how her clothes were removed. The victim refused [the petitioner]'s advances, and [the petitioner] started choking her. [The petitioner] then rubbed his "private on [her] private." [The petitioner] continued touching her for about ten to fifteen minutes, and then he told the victim to go take a shower. The victim said she showered and got dressed. [The petitioner] would not let her answer the telephone which had been ringing on and off that morning. The victim said it was her cousin . . . calling because the young women always walked to school together.

The victim said she and [the petitioner] left the house. [The petitioner] was carrying a kitchen knife with a black handle and told the victim not to "act stupid." The victim interpreted this to mean that she was not to run or scream. The victim said she was afraid that [the petitioner] was driving her somewhere to kill her. [The petitioner] and the victim left the apartment complex in [the victim's mother's] car. [The petitioner] placed the knife in the cup holder in the front seat armrest while he drove on the interstate. The victim said she kept talking, trying to calm [the petitioner] down because he was acting "agitated, real easy to get mad."

After awhile, [the petitioner] turned the car around and drove the victim to [the victim's cousin's] second floor apartment. [The petitioner] stood at the bottom of the staircase, and watched as the victim ran up to her cousin's apartment. The victim said [her cousin] was waiting for her at the top of the stairs, and the two young women went inside the apartment. The victim was crying. [The victim's cousin's] mother . . . asked the victim what was wrong, and the victim said she could not tell her. [The victim's cousin's mother] asked the victim if [the petitioner] had done something to her, and the victim nodded. [The victim's cousin's mother] called the victim's grandmother. The victim identified the comforter which was introduced as an exhibit at trial as the comforter which was on her bed when [the petitioner] accosted her.

On cross-examination, the victim acknowledged that she did not have any bruising on her neck after [the petitioner] choked her. She said that [the petitioner] never touched her with the knife's blade, but he kept the knife pointed in her direction. The victim agreed that the comforter was on her bed when her uncle and his girlfriend spent the night.

-3-

[The victim's cousin] testified that the victim usually called her in the morning when she was ready to leave for school. [The victim's cousin] said that when the victim did not call her on February 14, 2001, [the victim's cousin] started calling the victim's apartment. [The victim's cousin] said she was just starting to go over to the victim's apartment when [the petitioner] and the victim arrived. [The victim's cousin] said that [the petitioner] waited at the bottom of the stairs until the victim reached the top landing.

Michael Redd testified that he was the groundskeeper for the victim's apartment building and lived on the premises. Mr. Redd said that he was friendly with [the petitioner]. He saw [the petitioner] leave the apartment complex at approximately 8:00 a.m. in [the victim's mother's] Oldsmobile on February 14, 2001, but [the petitioner] did not speak to him. [The petitioner] drove toward Interstate 240.

Rachel Copeland, a forensic nurse examiner with the Memphis Sexual Assault Resource Center, testified that she attempted to take a blood sample from [the petitioner] for DNA sampling. [The petitioner] told her she would need a court order. A court order was obtained, and [the petitioner] again refused to cooperate. The trial court conducted a hearing and again ordered [the petitioner] to give a blood sample. When he continued to resist, [the petitioner] was sedated and a blood sample drawn.

Officer Carl Martin with the Memphis Police Department interviewed the victim on February 14, 2001. Officer Martin said the victim had been crying and was sometimes unresponsive to his questioning. The victim told him, however, that [the petitioner] accosted her when she got up to get ready for school. The victim told Officer Martin that [the petitioner] rubbed his penis on her vagina. [The petitioner] made the victim take a shower and then get into the car. Officer Martin said the victim told him that [the petitioner] drove around for awhile, and then returned to the apartment complex.

Special Agent Donna Nelson, a forensic scientist with the TBI, cut seven swatches of material from the victim's comforter. The first four swatches showed the presence of semen from two unidentified individuals. The semen sample from the last three swatches matched [the petitioner]'s DNA. On cross-examination, Agent Nelson testified that it was impossible to date the semen stains.

[The petitioner] called Alice Faye Robinson as a witness. Ms.

-4-

Robinson said that she lived in Cotton Plan[t], Arkansas, which was about sixty miles from Memphis. Ms. Robinson had known [the petitioner] for about twenty-five years. Ms. Robinson testified that [the petitioner] spent the night with her on February 13, 2001. The following morning, Ms. Robinson said that she, [the petitioner], and Ms. Robinson's granddaughter shopped for most of the day. [The petitioner] gave Ms. Robinson a wrist watch for Valentine's Day.

[The petitioner] testified that he was in Cotton Plan[t], Arkansas on February 13 and February 14, 2001. He said that he and [the victim's mother] had an argument about [the victim's mother's] cocaine use on the morning of February 13, and he drove to Arkansas around 4:00 p.m. to avoid further arguing. [The petitioner] said that [the victim's mother] had "a habit of calling the police" when she was angry. [The petitioner] said that [the victim's mother] called the police in July 2000 when he got angry because the victim had kept his daughter out past the time [the petitioner]'s daughter was supposed to go back to her mother's house. [The petitioner] said that he was charged with public intoxication and disorderly conduct on that occasion.

[The petitioner] said that he was not surprised that some of the semen stains on the victim's comforter matched his DNA because he and [the victim's mother] had previously had sexual intercourse on the comforter.

On cross-examination, [the petitioner] said that [the victim's mother] knew where he was going when he left Memphis on February 13, 2001. [The petitioner] said that he paid the note on the Oldsmobile while he lived with [the victim's mother] and considered the car as a joint asset. [The petitioner] acknowledged that he was arrested on the current charges in Arkansas on January 26, 2002, after a routine traffic stop. He said he was not driving the Oldsmobile at that time because the car had been impounded by then.

The State recalled [the victim's mother] as a rebuttal witness. [The victim's mother] testified that she had bought the Oldsmobile Cutlass about a year before she met [the petitioner], and that the car was hers alone. [The victim's mother] said that she never made arrangements for [the petitioner] to keep the car in Arkansas.

Id. at *1-4.

The trial court merged the petitioner's two convictions for aggravated kidnapping

into his conviction for especially aggravating kidnapping and sentenced him as a Range II, multiple offender to thirty-six years for his especially aggravated kidnapping conviction and four years for his sexual battery conviction. Id. at *1. The trial court ordered that the sentences be served consecutively, for an effective sentence of forty years. Id. On appeal, this court affirmed the petitioner's convictions but remanded for resentencing to determine whether the specific elements of the petitioner's South Carolina conviction would have constituted a Class C felony in Tennessee under the state of the law as it existed at the time of the offense. Id. at *11.

On remand, the trial court determined that the petitioner's South Carolina conviction for assault and battery of a high and aggravated nature would constitute at least a Class C felony in Tennessee. State v. Vick, 242 S.W.3d 792, 795 (Tenn. Crim. App. 2007). On direct appeal, this court reversed, concluding that there was insufficient proof to establish that the petitioner's South Carolina conviction would constitute the equivalent of a Class C felony in Tennessee and remanded for the petitioner to be sentenced as a Range I offender. Id. at 796. The petitioner was sentenced to an effective term of twenty-six years.

On July 15, 2008, the petitioner filed a *pro se* petition for post-conviction relief,[1] in which he raised, among other things, numerous allegations of ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing on February 2 and 3, 2012.

At the hearing, first counsel testified[2] that he was appointed to represent the petitioner on the original indictment, which went to trial on March 24, 2003. However, after picking the jury, the State informed him that there was some evidence, a blanket from the victim's bedroom, that had not been disclosed to him that "could possibly have some DNA on it." The blanket was relevant because the crimes were alleged to have occurred on or around the blanket. He felt that the State would have a very weak case against the petitioner if the DNA proved to be someone's other than the petitioner's. He thought that going to trial without testing the blanket would amount to malpractice, so he agreed that a mistrial was necessary in order to have DNA testing conducted. He said that the accused is normally in the courtroom, but he did not specifically recall whether the petitioner was in the courtroom when the mistrial was declared. He noted that it would have also been the trial court's practice to inform the accused in open court of a mistrial. He did not recall the petitioner's expressing any concern about the mistrial because they "had gone over that at that particular time," but the petitioner later did not want to give a DNA sample.

---

[1] It appears that the petitioner has also filed multiple habeas corpus petitions over the years.

[2] We will confine the majority of our factual recitation to the testimony relevant to this appeal.

First counsel testified that the petitioner gave him a list of possible alibi witnesses, and he did everything he could to interview those witnesses. He said that he personally drove to Cotton Plant, Arkansas, in an attempt to locate and interview those witnesses, but he was unable to locate all of them. He recalled that he met with a Ms. Robinson,[3] but he did not recall whether he interviewed other witnesses.

First counsel testified that he did not recall if he filed a motion for a speedy trial or if the petitioner filed a *pro se* motion for one. He said that, had the petitioner filed a motion that had merit, he would have argued it. With regard to selecting the trial date, first counsel said that the normal practice was for the parties to meet with the trial court and pick the first available date.

Second counsel testified that he took over the petitioner's case from first counsel and that he gave the petitioner's case "much more than average" diligence and time. Second counsel said that he hired an investigator to investigate all of the witnesses provided by the petitioner. He preferred to have his investigator interview the witnesses because otherwise "you end up becoming a witness yourself." Second counsel recalled that Alice Robinson testified at trial and was a good witness for the defense, even though "she showed her age somewhat . . . [and] was a little bit frail." Second counsel remembered the names of Damien Washington and Diedra Jones, but he could not remember why they were not called to testify at trial. He did not recall the petitioner giving him any affidavits from his alibi witnesses. Second counsel said that the petitioner was convicted because "the victim was extremely convincing and then you had this maintenance man that completely blew [the petitioner's] alibi out of the water, and then there was some supporting testimony from [the victim]'s friend and her mother whose home they immediately went to."

Second counsel testified that it was his understanding that the case was reset from the first trial date because it was discovered that a DNA sample had been taken from the blanket in the victim's bedroom, and the petitioner "demanded that [it] be tested." Second counsel said that it generally took a year to get DNA test results back, and the case went to trial in September 2004, about eighteen months after he got the case. He stated that he could not make a demand for a speedy trial when they were "waiting on a test that [the petitioner]'s demanded[.]"

The State submitted transcripts from three hearings and a partial transcript of the beginning of the petitioner's first trial. At a hearing on September 12, 2002, the petitioner

---

[3] Post-conviction counsel referred to this witness as Ms. Anderson in his question to first counsel. However, in light of the recitation of the trial testimony in our opinion on direct appeal, it appears as though he meant to say Ms. Robinson.

expressed that he wanted a new attorney. The petitioner insisted that he wanted a speedy trial and claimed to have filed a motion for one. Appearing that settlement negotiations were still in the works, the court maintained the scheduled trial date of January 6, 2003, but set an interim report date to discuss whether there would be a settlement.

At a hearing on October 29, 2002, the State informed the court that the petitioner did not want to accept a guilty plea offer and that, in the interim, the victim had given them more information indicating that the petitioner was "under indicted." As such, the State planned to resubmit the case to the grand jury on the charge of especially aggravated kidnapping. The petitioner admitted that he had not written out a list of witnesses for first counsel but had given first counsel his niece's address to try to lead him to possible witnesses. First counsel said that he had not talked to the petitioner's niece yet, but he talked to one witness in Arkansas who could not verify that the petitioner "was there at that particular time."

At a hearing on January 6, 2003, the State informed the court that it had brought a superceding indictment against the petitioner, charging him with especially aggravated kidnapping rather than aggravated kidnapping. First counsel indicated that he needed the twenty days afforded under the statute to prepare for trial under the superceding indictment. The petitioner then waived reading of the new indictment, and a trial was set for February 3, 2003.

At a hearing prior to the commencement of trial on March 24, 2003, the State formally nolle prossed the original indictment. Afterwards, first counsel informed the court that the petitioner felt that his case should be transferred to federal court and was not cooperating with counsel. First counsel told the court that, at the last court setting, the petitioner gave him the names of two alibi witnesses, which he investigated. One of the witnesses was in jail, and first counsel had arranged for the other to come and testify.

The petitioner testified at the evidentiary hearing that he did not consent to a mistrial of the first trial to have DNA testing conducted and claimed that he was not even in the courtroom at the time. He said first counsel never discussed the issue with him, and he did not learn the reason for the mistrial until he received a transcript of the proceeding. He admitted that he asked counsel to get a DNA expert, but he could not remember when. He later testified that he wanted the comforter from the victim's bed tested to show that it had not been washed as frequently as alleged by the victim's mother. He said that he would not have agreed to a mistrial because the comforter should have been tested prior to the first trial.

The petitioner testified that both counsel failed to investigate his witnesses. He said that there were multiple witnesses who could confirm that he was in Arkansas on the day of

-8-

the crimes had either counsel investigated. He stated that only one witness, Alice Robinson, was interviewed and testified at trial. He acknowledged that Robinson did in fact testify that he was in Arkansas on the date of the crimes but said that "she had lost a little memory as far as like remembering the color of her car[.]" He claimed to have obtained sworn affidavits from his witnesses, which he presented to both counsel. He said that neither counsel investigated the apartment complex groundskeeper, Mr. Redd, who said he saw the petitioner at the crime scene, or the victim's testimony regarding where he supposedly turned around on the interstate.

The petitioner testified that he filed a *pro se* motion for a speedy trial, after which, he claimed that the State nolle prossed his case and sought a superseding indictment in order to punish him for making the request. He stated that he made his speedy trial motion on September 12, 2002, and was given a trial date of January 6, 2003. He said, "Even after my motion for a speedy trial was filed and after I had picked a jury March 24th, 2003, I was tried eighteen months later after the second nol pros and the mistrial." He stated that the delay caused his witness, Alice Robinson, to deteriorate mentally, again explaining that she was unable to remember the color of her car.

After the conclusion of the evidentiary hearing, the post-conviction court denied the petition, finding that the petitioner failed to prove "that either of his attorneys' performance was deficient . . . [or] any prejudice created by any aspect of his attorney[s'] representation. He also has failed to meet his burden of proof in any of his allegations against the trial judge."

## ANALYSIS

On appeal, the petitioner makes the stand-alone claim that the post-conviction court "erred in denying post-conviction relief where [he] was denied the right to have a speedy trial." He also argues that he received the ineffective assistance of counsel because counsel failed to call additional alibi witnesses and failed to protect his right to a speedy trial.

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See

Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

## I. Speedy Trial

The petitioner argues that the post-conviction court erred in denying his claim that he was denied the right to a speedy trial.

The Sixth Amendment to the United States Constitution and article 1, section 9 of the Tennessee Constitution guarantee the accused the right to a speedy and public trial. In determining whether the petitioner's right to a speedy trial was violated by the delay in this case, we must consider the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) the petitioner's assertion of the right; and (4) the prejudice caused to the petitioner by the delay. See State v. Bishop, 493 S.W.2d 81, 83-84 (Tenn. 1973) (citing Barker v. Wingo, 407 U.S. 514 (1972)). The second factor "generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996) (footnotes omitted).

Although the petitioner cites the relevant law on this issue in his brief, he has failed to provide any clear analysis or argument as to the claim. In any event, the post-conviction court thoroughly addressed the petitioner's claim of a speedy trial violation and, after applying the four-factor test from Barker, determined that the petitioner's contention was without merit. The court found that even though the petitioner's trial occurred two and a half years after he was extradited back to Tennessee, the petitioner was responsible for the delay due to his lack of cooperation with his attorneys and demanding DNA testing, then refusing to comply with a court order to have his blood taken for DNA comparison. The court also determined that the petitioner had failed to show credible proof of prejudice caused by the delay, in that first counsel was only able to locate one of the petitioner's witnesses "just a few months after the petitioner was indicted" and the petitioner did not present any of the other alleged alibi witnesses at the evidentiary hearing. With regard to prejudice, the post-conviction court poignantly found:

> Although the petitioner claims prejudice by the delay, in that he testified

that his alibi witnesses all lived in Cotton Plant and could not be found on the day of trial, his first attorney, [first counsel], testified that he could not find the petitioner's witnesses when he investigated the case just a few months after the petitioner was indicted. He only remembered driving to Cotton Plant, Arkansas to interview Ms. [Robinson], who testified for the defense at trial. [Second counsel] also testified that he had an investigator look for these witnesses. None of the other alleged alibi witnesses was produced at the hearing on this petition, who were alleged to be friends of the petitioner.

The record fully supports the trial court's determination that the petitioner was not denied his right to a speedy trial, as the evidence shows the petitioner was responsible for the delay, and the petitioner failed to put on proof of prejudice. Even though the petitioner asserts on appeal that the delay prejudiced him because Robinson's mental condition deteriorated, there is no proof in the record that Robinson's mental health changed in the time between arrest and trial. Furthermore, the petitioner precipitated the delay and would thus be responsible for any mental deterioration that occurred.

## II. Ineffective Assistance of Counsel

The petitioner argues that counsel rendered ineffective assistance for failing to investigate all of his alibi witnesses and have them testify at trial. The petitioner also makes a one-sentence claim that counsel failed to ensure that his right to a speedy trial was upheld.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the Strickland test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

First counsel testified that the petitioner gave him a list of possible alibi witnesses, and he did everything he could to interview those witnesses. He drove to Cotton Plant, Arkansas, in an attempt to locate and interview those witnesses, but he was unable to locate all of them. He recalled meeting with Alice Robinson, but he did not recall whether he interviewed other witnesses. Second counsel testified that he hired an investigator to investigate all of the witnesses provided by the petitioner, and he gave the petitioner's case "much more than average" diligence and time. He did not recall the petitioner's giving him any affidavits from his alibi witnesses. Second counsel recalled that Robinson testified as an alibi witness at trial and was a good witness for the defense, even though "she showed her age somewhat . . . [and] was a little bit frail." Second counsel remembered the names of Damien Washington and Diedra Jones, but he could not remember why they were not called to testify at trial. Second counsel explained that the petitioner's claim of alibi was unsuccessful because "the victim was extremely convincing and then you had this maintenance man that completely blew [the petitioner's] alibi out of the water, and then there was some supporting testimony from [the victim]'s friend and her mother whose home they immediately went to."

In its findings, the post-conviction court implicitly accredited the testimony of first and second counsel as to their efforts in investigating the petitioner's alibi. Therefore, the petitioner has not shown that counsel's actions in investigating the petitioner's alibi witnesses fell below an objective standard of reasonableness. Moreover, the petitioner did not present the testimony of these witnesses at the evidentiary hearing. To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Thus, the petitioner has failed to establish prejudice.

The petitioner is also not entitled to relief on his claim that counsel failed to ensure that his right to a speedy trial was upheld because, as we determined above, the petitioner was responsible for the delay and he failed to put on proof of prejudice.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE

-13-